**AFFIDAVIT OF BOSTON POLICE OFFICER MICHAEL O'ROURKE**

I, Michael O'Rourke, being duly sworn, depose and state as follows:

1. I am a sworn officer with the Boston Police Department ("BPD") where I have been employed for more than 13 years. My entire career has been spent in District B-2, which covers most of the Roxbury section of our city, including Dudley Square.

2. I have been involved with the Orchard Gardens Housing Development (hereinafter referred to as "the Development") for much of my BPD career. After graduating from the Academy in 2004, I was assigned to general patrol in District B-2 for approximately 2 years. Beginning in or about 2006, I moved to an anti-crime car, which is a plainclothes, proactive assignment for the next seven years. Throughout this period, I regularly patrolled in and around the Development and got to know many of its residents as well as the individuals who simply hung out there.

3. After leaving the Anti-Crime Car in approximately 2013, I was assigned to the Orchard Gardens Safe Streets Team, a small plainclothes unit whose responsibility was to patrol in and around the Development. Since 2015, I have been assigned to a

~1~

walking beat inside the Development.

4. During my tenure with the Boston Police Department, I have participated in scores of investigations and arrests relating to the distribution of controlled substances including cocaine, cocaine base (also known as "crack cocaine"), heroin, marijuana, and other illegal drugs and have received training in the area of narcotics investigations.

5. This affidavit is submitted in support of an application for a criminal complaint charging **TYREE DRAUGHN** with distributing cocaine base, a Schedule II controlled substance, within 1000 feet of a school in violation of Title 21, United States Code, Sections 841(a) and 860.  On May 10, 2017, **DRAUGHN** sold an eight ball of crack cocaine to a Cooperating Witness ("the CW") working for BPD and the ATF inside a Nissan Altima bearing MA Reg. 6KJ343 in a small parking lot inside the Development. As is indicated below, I drove past the Altima shortly after the buy was completed and then identified **DRAUGHN** as the passenger in that car. I have also identified **DRAUGHN** from the May 10 video as the person who sold the CW the drugs and arrested him on June 5, 2017 for motor vehicle violations and recovered nearly $1500, three digital scales and four phones (including a phone that rang when we dialed the number the CW used to order the drugs on May 10).

˘2˘

6. I am familiar with and participated in the underlying investigation. I have also reviewed reports and recordings and spoken with other officers and agents involved in it as well.

7. This affidavit does not set forth all the facts developed during the underlying investigation. Rather, it sets forth facts I believe to be sufficient to establish probable cause that **DRAUGHN** committed the crime set forth in the accompanying Criminal Complaint.

8. For some time, myself and other officers from District B-2 have been supporting the investigation of gun and drug trafficking in and around the Development by ATF and BPD's Special Investigation Unit ("SIU"). During these investigations, cooperating witnesses have made numerous purchases of crack cocaine in and around the Development. Based on our familiarity with the area and with dealers who operate inside the Development, myself and other officers assigned to District B-2 have supported these investigations by, among other things, providing intelligence, surveillance, identifying targets, and identifying the exact location of videotaped buys in order to facilitate accurate school zone measurements.

9. The controlled purchase of crack cocaine made from **DRAUGHN** on May 10, 2017 was initiated at approximately 4:20p.m.

when the CW met with investigators in anticipation of going into the Development. The CW was searched for money and contraband (with negative results), and provided with audio/video recording equipment and $175 of BPD buy money with which to make a purchase.

10. At approximately 4:25p.m., the CW placed a consensually recorded call to **DRAUGHN** at 857-200-7201, the number he provided to the CW during an earlier buy that took place on April 19, 2017. In the resulting call, the CW asked **DRAUGHN** for an "eight ball" and **DRAUGHN** immediately said, "I got it." The CW then asked "how much" and **DRAUGHN** said he wanted "$200 or $185" that the CW told him was "too much." **DRAUGHN** then asked the CW, "How much you got? And when told the CW had $150, **DRAUGHN** told the CW he would do it "only for you." The CW initially suggested they meet in the Goodwill Parking Lot, but **DRAUGHN** said it was "too hot" and told the CW she should go "where we met the last time" (on Shabazz Way inside the Orchard Park Development). The CW agreed.

11. The CW was then driven in to the area of the Development so that she could walk in and meet with **DRAUGHN.** As she was getting ready to get out, **DRAUGHN** called and asked where she was. The CW told **DRAUGHN** she was walking on Harrison Avenue in the area of Rosie's and he agreed to meet her there. The electronics were then activated and the CW went out on the street.

12. After the CW got to the area of Rosie's place, she received another call from **DRAUGHN** directing her to go into the Development to meet. The CW then walked down Harrison Avenue, took a left on Eustis Street, went to a small parking lot between Degauthier Way and Harrison Avenue inside the Development and got into the gray Nissan Altima that the video showed bore Massachusetts Registration 6KJ343 and that I know is registered to ANDRE PARNHAM-RANKIN, who also sold crack cocaine to the same CW approximately a year earlier.

13. The Nissan was occupied by **DRAUGHN** and PARNHAM-RANKIN (who the CW identified from a picture shown to her after the buy). When she first got in the car, the CW asked **DRAUGHN**, "Papi, 150?" and he said "Why Not?" The CW then asked if it was "good" and **DRAUGHN** said it was. **DRAUGHN** and the CW then exchanged one bag of what was subsequently identified and field-tested positive as cocaine base for $150. After getting **DRAUGHN** (who was wearing a plastic bag over his hand) to place it in another plastic bag, the CW thanked him and left.

14. The CW then went to a predetermined meeting location where she met with the investigators, turned over the drugs, the recording equipment, $25 in unused BPD funds, and was debriefed about the buy. The CW stated that she had done the deal with the passenger inside the Nissan Altima, who she stated was

manipulating the drugs in between his legs on the floor of the car. She also identified PARHAM-RANKIN from a picture shown to her during the debriefing.

15. The drugs were identified as crack cocaine and field-tested positive for cocaine base before being processed into evidence so that they could be sent to the State Police Drug Lab for further testing. Three discs (one audio CD from the pre-buy phone call to **DRAUGHN** at 857-200-7201 and two audio video recordings from the buy) were also entered by ATF into evidence).

16. After the CW had been debriefed, ATF S/A Brian Higgins advised me of the location and the car involved in the buy. As discussed above, I was familiar with that car and knew it to be registered to ANDRE PARNHAM-RANKIN. A short time later, I saw PARHAM-RANKIN's car parked on Eustis Street and thereafter determined via an FIO that it had two occupants: PARHAM-RANKIN (the driver) and **DRAUGHN** (the front seat passenger). That was subsequently confirmed when my partner and I were flagged down by a couple who stated that they had been involved in a minor accident with the driver of a car who could not produce a registration. We then learned that the car involved was PARHAM-RANKIN's Nissan Altima and saw that both PARHAM-RANKIN and **DRAUGHN** were present.

17. I had further interaction with **TYREE DRAUGHN** on June 5,

2017 when I received a radio call regarding a group hanging out in front of 39 Bethune Way inside the Development. When we arrived, we saw JAYLIN HAWKINS and other individuals walking away and saw a gray BMW (that I knew to be registered to **DRAUGHN**'s father-in-law). When that BMW committed a motor vehicle violation, we pulled it over and learned that **DRAUGHN** (whose license to operate had been revoked) was the operator.

18.  We thereafter placed **DRAUGHN** under arrest for operating after suspension and recovered $970 divided up between various pockets in his black Nike Jacket, three digital scales, four cell phones and additional cash.[1] When I called 857-200-7201, (the number **DRAUGHN** provided to the CW on April 19 and the number used to contact **DRAUGHN** on May 10) one of the phones recovered rang.

19. On June 12, 2017, BPD Sergeant Charles Cellucci of District B-2 conducted a school zone measurement with respect to **DRAUGHN**'s May 10, 2017 distribution. Sergeant Cellucci utilized a Measuremaster-Truemeter measuring device and determined that the distance between the location of the buy and rear fence line of the Boston Day and Evening Academy, a public charter high school located at 20 Kearsage Avenue, was less than 1000 feet.

20.  Based upon the foregoing, I submit there is probable

---

[1] Another $453 was found inside the car making the total amount of cash making found to be $1423.

cause to believe that, on May 10, 2017, **TYREE DRAUGHN** distributed cocaine base, a Schedule II controlled substance, within 1000 feet of a school in violation of Title 21, United States Code, Sections 841(a) and 860.

Signed under the pains and penalties of perjury this 14 day of June, 2017.

_____
OFFICER MICHAEL O'ROURKE

Sworn to and subscribed before me this 14 day of June, 2017.

_____
JENNIFER C. BOAL
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS